### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF FLORIDA
### GAINESVILLE  DIVISION


**JESSICA D. LOWE,**

      **Plaintiff,**

**vs.**                                    **Case No.  1:10cv202-WCS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

_____/


### <u>MEMORANDUM OPINION</u>

      This is a social security case referred to me for all further proceedings.  Doc. 16.
Plaintiff, Jessica D. Lowe, applied for disability insurance benefits and supplemental
security income benefits.  Her last date of insured status for disability benefits will be
December 31, 2012.  Plaintiff alleges disability due to bipolar disorder, depression,
headaches, and pain, with onset on July 1, 2007.  Plaintiff was 27 years of age on the
date of the Administrative Law Judge's decision (April 23, 2010), has a 12th grade
education with some college credits, and has past relevant work as a cook, assistant
manager, and hardware store cashier.

The Administrative Law Judge found that Plaintiff had the residual functional capacity to do a limited range of sedentary work, with an opportunity to change positions at will.  He found that she cannot climb ladders, ropes, scaffolding, but can occasionally climb stairs, balance, bend, stoop, kneel, crouch, or crawl.  He found that she cannot tolerate strong bright lights, work with poor ventilation, or work around hazardous machinery.  He found that Plaintiff is limited to simple tasks in an habituated and objective oriented setting, and cannot deal with the stress of meeting high production quotas or rapidly perform assembly line work.  He found that she cannot do her past relevant work.  Relying upon testimony from a vocational expert, the ALJ found that Plaintiff could do sedentary work as an addressor, order clerk, or call out operator, and is not disabled.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232,

1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**

Plaintiff testified that her back pain caused her to be unable to work.  R. 42.  She said her back pain was an ache, but if she sat or stood too long, it turned into a shooting pain down into her legs.  R. 41-42.  She said the pain was constant, and that with pain medications, it was 5 on a scale of 10, but 9 without pain medications.  R. 43.  She said that the pain was "all over," but she had not been formally diagnosed with fibromyalgia.

R. 51.  She said that she took Lithium three times a day and Tylox[1] twice a day.[2]  R. 41.

She thought that both medications made her tired.  R. 41-42.

Plaintiff said that she suffered really bad migraine headaches, and that a cyst

was found on her brain and she had severe hydrocephalus.  R. 43.  The water was

drained, but the cyst could not be excised, and she said she "always" has a headache

that is not as bad as before, but is constant.  R. 43-44.  She experienced a really bad

migraine headache lasting a few hours about once a month, causing her to vomit.  R.

44.  After such a migraine, she said she did not feel good, but felt as though she was

just getting over the flu.  *Id.*

Plaintiff said that she had memory problems and no longer tries to pay the family

bills due to this forgetfulness.  R. 44-45.  She said she leaves notes "all over the house,"

reminding her of things she needs to remember.  R. 45.

Plaintiff cried at the hearing and said she cries every day without reason.  R. 46.

She said that she had been diagnosed as bipolar and suffered major depression.  *Id.*

---

[1] Tylox is a pain medication that is used for moderate to moderately severe pain.
Tylox contains two medications, acetaminophen (Tylenol) and oxycodone.
PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[2] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS'
DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS
DESKTOP REFERENCE, found at < http://www.pdrhealth.com/drugs/drugs-index.aspx >.
Information about medical terms and prescription drugs come from DORLAND'S MEDICAL
DICTIONARY FOR HEALTHCARE CONSUMERS, available at:  http://www.mercksource.com
(Medical Dictionary link) or MEDLINE PLUS, found at
www.nlm.nih.gov/medlineplus/mplusdictionary.htm.  Social Security Rulings can be
found at:  http://www.ssa.gov/OP_Home/rulings/rulfind1.html.   The pages at these
websites are not attached to this report and recommendation as the information is
relatively well-settled, the precise definitions are not at issue in this case, and the
definitions are not likely to be in dispute.

She said that on some days, she cannot do anything, and does not even bathe.  R. 47.
She said that she experiences depression about four times a week.  *Id*.  She said she
had experienced the manic phase twice in the past year, lasting a few days to five days
each time.  *Id*.  She said she experienced these symptoms despite medication.  R. 48.
Plaintiff said that she cannot concentrate very well, and feels guilty and useless.  R. 49.
She said she does not ever want to leave her home, and does so maybe once a week,
going to her father's house to "make myself leave the house."  *Id*.

Plaintiff said that her husband took care of all of the chores around the house.  R.
50.  She said that her inability to help was both physical and mental.  *Id*.  She said that
during the day, other than getting her children up so they can dress and go to school,
watching television, and occasionally going to her father's house (he picks her up), she
does nothing.  R. 50-51.

Plaintiff said that she could sit for a couple of hours, but then would need to move
her position due to lower back pain.  R. 52.  She said she could walk for 20 to 30
minutes, but could stand at the sink washing dishes for only about five minutes.  *Id*.
She said that she was told not to lift anything over 10 pounds after the surgery for the
cyst on her brain.  R. 52-53.  She thought that she could lift 5 to 10 pounds.  R. 53.

Plaintiff said that her most serious impairments keeping her from work were
depression, bipolar diagnosis, and pain.  R. 54.  She said she could not predict which
days she would be unable to go to work.  *Id*.

**Medical evidence**

On February 5, 2006, Plaintiff was treated for dizziness, headaches, and pain in her legs.  R. 319.  On March 28, 2006, she sought treatment for back and leg pain.  R. 321.  On June 23, 2006, she reported headaches with intermittent sharp pain, dizziness, loss of balance, heavy legs, and vomiting.  R. 320.

Plaintiff was treated at Shands at University of Florida Clinic in early July, 2006.  R. 257.  She had experienced an eight week history of sudden-onset headaches and visual blurring.  *Id*.  Neuroimaging of her brain had revealed a third ventricle colloid cyst.  *Id*.  It was determined that Plaintiff had an enlarged blind spot in both eyes, consistent with papilledema[3] secondary to raised intracranial pressure.  *Id*.

On July 13, 2006, she underwent brain surgery with a primary diagnosis of hydrocephalus; after surgery, her headaches had "completely resolved" and her vision seemed to have improved.  R. 259, 249, 247.  She had some minor headaches while in the hospital, but those were well controlled with oral pain medicine.  R. 249.

On July 16, 2006, Plaintiff awoke with vision problems and a headache, and went to the emergency room.  R. 251.  Her headache pain was described as 7 on a scale of 10.  *Id*.  She said that the pain was relieved by Lortab.[4]  R. 252.  She also reported that she was anxious.  *Id*.

---

[3] Papilledema is a swelling and protrusion of the blind spot of the eye caused by edema, also called choked disk.  MEDLINE PLUS (MERRIAM-WEBSTER).

[4] Lortab is one of the brand names for hydrocodone.  PHYSICIANS' DESK REFERENCE (2004), p. 3233.  Hydrocodone is a semisynthetic narcotic derivative of codeine having sedative and analgesic effects more powerful than those of codeine.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

On August 23, 2006, Plaintiff reported that she had persistent papilledema.  R. 259.  Her headaches, however, had completely resolved and she felt that her vision had improved.  *Id.*  Her physician, David W. Pincus, M.D., said he was "not particularly concerned with the persistent papilledema since her surgery was not that long ago."  *Id.*  He thought that the surgery was "working well."  *Id.*  He ordered an MRI.  *Id.*

On April 2, 2007, Plaintiff returned to her physician for a evaluation of possible shunt replacement.  R. 263.  The MRI had shown no hydrocephalus.  *Id.*  She reported continued symptoms, however, complaining that she had fatigue, memory loss, muscle ache, nausea, and headaches.  *Id.*  She said that the symptoms had suddenly begun a week earlier.  R. 264. The symptoms were intermittent and currently were absent.  *Id.*  She also reported that she had upper extremity weakness, bilaterally, and malaise.  *Id.*  Most of the results of the neurological examination were normal.  R. 265-266.  The differential diagnosis was neurologic deficit:  conversion disorder, malingering, neuropathy, vasculitis.  R. 266.  The order for evaluation of the shunt problem was cancelled as there was no reason for that evaluation.  *Id.*  Plaintiff was told to followup with Dr. Pincus the next week.  *Id.*  The visit was considered an emergency medical condition due to severe pain, acute onset, and impairment of bodily function.  R. 267.  The discharge instruction noted headache, etiology unknown.  *Id.*  Fioricet B[5] was prescribed.  *Id.*

---

[5] Fioricet is a strong, non-narcotic pain reliever and relaxant, is prescribed for the relief of tension headache symptoms caused by muscle contractions in the head, neck, and shoulder area.  It combines a sedative barbiturate (butalbital), a non-aspirin pain reliever (acetaminophen), and caffeine.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

On April 3, 2007, Plaintiff was seen by Michael Antonucci, M.D., at the Shands Emergency Department.  R. 268.  It was reported that an MRI on March 29, 2007, showed stable ventricular size and cyst size, but Plaintiff reported constant headaches, with the location varying, and constant fatigue.  *Id.*  She said that her symptoms had become worse over the prior two months.  *Id.*  A neurological examination was conducted.  R. 268-269.  Plaintiff's remote and recent memory were intact, and her attention span and concentration were normal.  R. 269.  The rest of the results of that examination were normal.  *Id.*  There was no evidence of hydrocephalus, and the cyst was of stable size.  *Id.*  The diagnosis included chronic headaches.  *Id.*  A lumbar puncture test was offered to evaluate whether Plaintiff suffered from increased spinal pressure, but this was declined.  *Id.*  Dr. Antonucci said: "At this point, there is no indication for acute neurosurgical intervention."  *Id.*

On April 30, 2007, Plaintiff was seen by Jeffrey Borkoski, M.D.  R. 295.  She reported that she had chronic headaches, intermittent blurred vision, pain in her jaw, and intermittent chest pains.  *Id.*  Plaintiff's memory was determined to be within normal limits.  *Id.*  She had no visual deficit.  *Id.*  Her motor strength was intact (5/5) bilaterally in upper and lower extremities, without muscle atrophy, and her gait was within normal limits.  *Id.*  Dr. Borkoski's impression was chronic daily headache, with episodic probable migraines, idiopathic low back pain, but with no evidence of myelopathy,

radiculopathy, or polyneuropathy.  *Id.*  He prescribed Cymbalta,[6] and Darvocet[7] or

Motrin.  *Id.*

An MRI was performed on Plaintiff's low back, from L1 to S1.  R. 296.  The

results were normal.  *Id.*

On June 18, 2007, Plaintiff was seen by neurologist Benjamin H. Eidelman, M.D.

R. 280-282.  She reported a two month history of back pain.  R. 280.  The pain had

become generalized, migrating from her lower back to her thighs.  *Id.*  She also reported

numbness over the second and third digits of her left foot.  *Id.*  She reported that her

tolerance for exercise had decreased considerably.  *Id.*  She had also experienced

frequent urination.  *Id.*  She had no weakness in her upper limbs.  *Id.*  Dr. Eidelman

noted a "remote" history of headaches related to hydrocephalus secondary to a colloid

cyst.  *Id.*  He said: "The headache has abated and she reported improving cognition."

*Id.*  There was some suggestion of depression, and Plaintiff's mother said that she did

not feel that Plaintiff's intellectual functioning had returned to "baseline levels."  *Id.*

Plaintiff's medications included Fioricet and Lortab as needed.  R. 281.  With the

exception of some suggestion of weakness of Plaintiff's hamstrings, bilaterally, walking

with "a rather cautious pattern . . . with reduced foot clearance," and paraspinal muscle

spasm in the lumbar region with marked tenderness over both sacroiliac joints, the

---

[6] Cymbalta is used to treat major depression and diabetic neuropathy, a painful nerve disorder associated with diabetes that affects the hands, legs, and feet. Cymbalta is also used to treat generalized anxiety disorder and fibromyalgia. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[7] Darvocet is used for the relief of mild to moderate pain, with or without fever. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

results of Dr. Eidelman's examination were normal.  *Id.*  He noted that an MRI of

Plaintiff's lumbar spine was "unremarkable."  *Id.*  Dr. Eidelman's assessment was low

back pain, diffuse and non-neurological, with the suggestion that musculoskeletal

sources of that pain needed to be explored, with the possibility of sacroiliac joint

dysfunction.  R. 282.  He also suggested laboratory work to determine if there were a

rheumatological condition.  *Id.*  He also ordered an EMG[8] of Plaintiff's lower back.  *Id.*

An x-ray on June 18, 2007, of Plaintiff's sacroiliac joints was normal.  R. 279.

The EMG study on June 20, 2007, of Plaintiff's left arm and leg was normal, and there

was no evidence of lumbosacral radiculopathy or myopathy.  R. 277.

On July 5, 2007, Plaintiff was examined by William E. Hogan, M.D., on referral by

Dr. Eidelman.  R. 272.  Plaintiff said that she had noticed pain beginning in her right

knee, and then in her left knee, progressing into her back and lower extremities.  *Id.*

She said her symptoms were worse with activity, but were temporarily relieved with

sitting, but she could not sit too long.  *Id.*  She described the pain as from 7 to 10 daily.

*Id.*  She said that Percocet,[9] Darvocet, Lortab, tramadol,[10] ibuprofen, Mobic, and

Cymbalta had not helped.  *Id.*  Her current medications were Fioricet, Lortab, and

---

[8] An EMG is an electromyogram.  Electromyography is an electrodiagnostic
technique for recording the extracellular activity of skeletal muscles at rest, during
voluntary contractions, and during electrical stimulation.  DORLAND'S MEDICAL
DICTIONARY FOR HEALTHCARE CONSUMERS.

[9] Percocet, a narcotic analgesic, is used to treat moderate to moderately severe
pain.  It contains two drugs – acetaminophen and oxycodone.  Acetaminophen is used
to reduce both pain and fever.  Oxycodone, a narcotic analgesic, is used for its calming
effect and for pain.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[10] Tramadol hydrocholoride is marketed as Ultram, a centrally acting synthetic opioid
analgesic.   PHYSICIANS' DESK REFERENCE (2005).

Mobic.[11]  *Id.*  On examination, Plaintiff had normal gait, normal coordination, normal spinal posture, normal strength bilaterally in the lower extremities, normal reflexes, and normal sensation bilaterally in the lower extremities.  R. 273.  The EMG was within normal limits.  *Id.*  Radiography of the SI joints was normal.  *Id.*  He noted that a neurologist had thought on June 18, 2007, that her pain was musculoskeletal rather than neurological.  *Id.*  Dr. Hogan's impression was musculoskeletal mechanical back pain with a possible discogenic component not seen by MRI.  *Id.*  He referred Plaintiff to physical therapy.  *Id.*

Also on July 5, 2007, Plaintiff was seen by Michael D. Osborne, M.D., on referral from Dr. Eidelman.  R. 274.  He supervised Dr. Hogan's examination and agreed with the findings and plan.  *Id.*  He noted that Plaintiff was dysphoric and tearful during the examination.  *Id.*  Her gait was nonantalgic.  *Id.*  Plaintiff had good range of motion in her back in all directions.  R. 275.  She had some myofascial tenderness in her lumbar spin and in her gluteal muscles, "but she lacks widespread tenderness of fibromyalgia-type symptoms."  *Id.*  He noted that the MRI of her lower back was unremarkable, but he said that "certainly discogenic back pain can present with fairly normal MRI findings."  *Id.*  Dr. Osborne strongly recommended that Plaintiff engage in physical therapy.  *Id.*  He recommended that Plaintiff not use pain medications such as Darvocet, hydrocodone, and Percocet, but should use anti-inflammatories and muscle relaxants as needed.  *Id.*

---

[11] Mobic is a nonsteroidal anti-inflammatory drug (NSAID) in prescription form. It is used to relieve the pain and stiffness of osteoarthritis and rheumatoid arthritis. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

On August 7, 2007, Plaintiff was seen by Dr. Borkoski at Southeastern Neurology. R. 293. She complained of low back pain but she was found to be alert, oriented, attentive, yet her comprehension was decreased. *Id.*

On September 11, 2007, Plaintiff was seen again by Dr. Borkoski. R. 291. She was alert, attentive, and her comprehension was intact. *Id.* Her motor strength was 5/5 throughout. *Id.* His impression was idiopathic low back pain. R. 292. A trial of Lyrica[12] was initiated. *Id.*

On January 26, 2008, Plaintiff was evaluated on a consultative basis by Eftim Adhami, M.D. R. 325-326. Plaintiff told Dr. Adhami that she had migraine headaches. R. 325. She said she could not drive in the past due to visual changes, but that this impairment was "rare today." *Id.* She reported that she had lower back pain radiating to both legs, ankles, and feet, that sometimes her whole body hurt, and that she felt tired and could not sleep. *Id.* Plaintiff said that she had tried Lyrica for fibromyalgia, but it did not help her pain. *Id.* She listed Percocet and ibuprofen as her current medications. *Id.* On examination, Plaintiff's vision was unimpaired (10/10 in both eyes), and her cranial nerves were fully functional. *Id.* There was no lumbar paravertebral muscle spasm, straight leg raising was normal, and her muscle strength was 5/5 in all muscles without atrophy. *Id.* Plaintiff's walk was normal. *Id.* Plaintiff's mood, judgment, expression, and understanding was normal. *Id.* Dr. Adhami did not detect

---

[12] Lyrica is a medicine used to treat seizures, pain from damaged nerves (neuropathic pain) that occur from diabetes and shingles (painful rash caused by chickenpox virus), and fibromyalgia (widespread muscle pain). PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

any signs of fibromyalgia.  *Id*.  Dr. Adhami concluded that while Plaintiff had "multiple pains of unknown origin," "there are no characteristic points of fibromyalgia."  R. 326.

On January 29, 2008, Plaintiff returned to Dr. Borkoski.  R. 400.  She complained of headaches, and pain in her low back, legs, feet, shoulders, and arms.  *Id*.  Her mental status was again normal.  *Id*.  Her gait was normal.  R. 401.  Dr. Borkoski noted that the trial of Lyrica had failed to help.  *Id*.  His diagnosis was chronic pain syndrome and headaches.  *Id*.  He renewed the prescription for Percocet.  *Id*.  She was also taking Darvocet and Cymbalta.  *Id*.

On February 26, 2008, Dr. Borkoski again saw Plaintiff.  R. 398.  She reported an adverse reaction to Zoloft, and had stopped taking it.  *Id*.  She was also taking Lyrica, Valium, and Percocet.  *Id*.  She said she had little relief with Percocet.  *Id*.  She said she was randomly dizzy, with pain.  *Id*.  Her mental status and motor strength were both normal.  *Id*.

On February 28, 2008, Plaintiff was examined on a consultative basis by Linda Abeles, Ph.D., to determine her mental functional capacity  R. 335-337.  She was taking Percocet, ibuprofen, and Valium, and was under the care of Dr. Borkoski.  R. 335.  Dr. Abeles said that Plaintiff had a family history of substance abuse and mental illness, and her father had fibromyalgia.  *Id*.  She had been attending Santa Fe Community College intending to become a nurse when she was diagnosed with the brain cyst.  *Id*.  The cyst was benign but inoperable.  R. 337.  She had been unsuccessful in her attempt to return to school after surgery.  R. 335.  She said she left her last job in June, 2007, due to her medical condition.  *Id*.  She was married, with two children.  R. 336.  Plaintiff had a valid driver's license, but no longer drove a motor vehicle.  *Id*.  Her gait

was within normal limits, and she had no obvious impairments of vision, hearing, or

speech.  *Id.*  She was pleasant during the examination, and the results were considered

by Dr. Abeles to be valid.  *Id.*  Dr. Abeles determined that Plaintiff's judgment was intact,

but her verbal reasoning ability was "overly concrete."  *Id.*

> Moreover, upon superficial examination, the claimant's recent memory
> abilities appeared decreased in that she was able to recall only one out of
> three words in a five-minute delay; on the other hand, she was able to
> recall six numbers forward, suggestive of intact immediate memory
> abilities.

*Id.*  She noted that Plaintiff reported that she experienced "affective disturbances

including anxiety and depression along with neurovegetative disturbances in both sleep

and appetite, citing a recent 10-pound weight loss."  *Id.*  Dr. Abeles said that Plaintiff

denied any history of auditory or visual hallucinations and "there is no indication of

psychotic or thought disorder."  *Id.*  Dr. Abeles's diagnostic impression was cognitive

disorder, not otherwise specified, and depressive disorder, not otherwise specified.  R.

336.  Dr. Abeles concluded that Plaintiff had "some cognitive impairments" with respect

to memory, but recommended that she be further evaluated.  R. 337.  She said that her

"current level of functioning would preclude her from obtaining or maintaining

employment" and added that "[p]rognosis for future success in the workplace appears

largely dependent upon the claimant's medical condition."  *Id.*  She assigned a current

Global Assessment of Functioning (GAF)[13] score of 60.  R. 336.

---

[13] Axis V of the DSM-IV Multiaxial System and the meaning of the GAF scores is
explained at:  http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp."  The GAF scale
reports a 'clinician's assessment of the individual's overall level of functioning.'
*American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders*
30 (4th ed. 1994)."  Sims v. Barnhart, 309 F.3d 424, 427 n. 5 (7th Cir. 2002).

Plaintiff was seen at Meridian Behavioral Healthcare, Inc., on March 4, 2008, for mental health treatment.  R. 356, 360.  She reported that she had worked for about 5 years as a sales associate for Ace Hardware and had moved up to assistant manager. R. 360.  She said that she enjoyed drawing, watching television, and doing things with her children, but had difficulty with these activities.  *Id.*  She said her grandmother killed her husband because she was bipolar, and that her mother, brothers, and cousins are alcoholics.  *Id.*  She said that prior to her brain surgery, she had been in control of things, was very focused and goal determined, but now feels useless and hopeless.  R. 361.  Her insight into her problems was adjudged to be good.  R. 362.  Her willingness for therapy was high, but she did not like to leave her home at all.  *Id.* and R. 363.  The diagnostic impression was pain disorder associated with psychological factors and a medical condition, major depressive disorder, single episode, severe without psychotic features.  R. 363.  Plaintiff reported that she had suffered depression and pain for about a year.  R. 356.  She also said she had memory problems.  *Id.*  She reported that she had been feeling hopeless, sad, and isolated, lacked motivation and appetite, and kept to herself.  *Id.*  It was also determined that she met the criteria for a diagnosis of

---

GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Manual at 34.  GAF scores of 51-60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).

adjustment disorder with depressed mood, rule out "MDD" (manic depressive disorder), recurrent and moderate.  *Id*.  She was referred to a psychiatrist.  *Id*.

On March 7, 2008, Plaintiff saw Dr. Borkoski as a followup for headaches.  R. 396.  He noted that Plaintiff's parents were divorcing and she was very depressed.  *Id*. She was taking Vicodin[14] without some effects and Ultram[15] without benefit.  *Id*.  Her mental status was normal and her motor strength was intact (5/5).  *Id*.  Her gait was also normal.  R. 397.  Dr. Borkoski's impression was intractable "CDH" (probably chronic daily headaches) and fibromyalgia.  *Id*.  Dr. Borkoski did not report, however, that he had detected the pain trigger points that are the hallmark of a diagnosis of fibromyalgia.[16]

On March 24, 2008, Plaintiff underwent a psychiatric examination at Meridian Behavioral Healthcare, Inc.  R. 352-355.  She again said she had been depressed for about a year.  R. 352.  Cymbalta, Elavil, and Zoloft had not helped.  *Id*.  She said she became depressed when she learned that they could not fix what was wrong with her.

---

[14]  Vicodin is a brand name for hydrocodone.  Hydrocodone is a semisynthetic narcotic derivative of codeine having sedative and analgesic effects more powerful than those of codeine.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[15] Ultram (tramadol hydrochloride tablets) is a centrally acting synthetic opioid analgesic.  PHYSICIANS' DESK REFERENCE (2005).

[16] The signs of fibromyalgia, according to American College of Rheumatology guidelines, are primarily tender points on the body.  Green-Younger v. Barnhart, 335 F.3d 99, 107 (2nd Cir. 2003).  The court there said:  "Green-Younger exhibited the clinical signs and symptoms to support a fibromyalgia diagnosis under the American College of Rheumatology (ACR) guidelines, including primarily widespread pain in all four quadrants of the body and at least 11 of the 18 specified tender points on the body."  *Id*.

*Id.* She felt anxiety and anhedonia.[17]  *Id.*  She was still taking Valium and Percocet.  *Id.*

It was recommended that she titrate off Valium and take Seroquel[18] and Wellbutrin.[19]  R.

355.  A GAF score of 50 was assigned and her prognosis was only fair.  *Id.*

Plaintiff saw Dr. Borkoski again on March 25, 2008.  R. 394.  Her mental status

was normal and her motor strength was intact (5/5).  *Id.*  His impression was chronic

intractable headaches, insomnia, and manic-depressive disorder (bipolar disorder).  R.

395.  He recommended that Plaintiff be referred to pain management.  *Id.*

On April 18, 2008, Plaintiff was seen again at Meridian Behavioral Healthcare,

Inc.  R. 367.  She said that Wellbutrin, Seroquel, Zoloft, Cymbalta, Elavil either had

produced negative side effects or had not helped, and she did not want to take any

medication.  R. 368.  It was noted that she had a history of noncompliance with

prescribed medications.  *Id.*  She agreed, however, to try Cymbalta again and that was

prescribed.  *Id.*  Her mood was depressed and she was crying.  *Id.*

On April 22, 2008, Plaintiff was seen by Dr. Borkoski for a followup.  R. 392.  His

neurological examination reported normal findings.  *Id.*  His diagnosis was chronic daily

headaches and "MDD," manic-depressive disorder (bipolar disorder).  R. 393.

---

[17] Anhedonia is a total loss of feeling of pleasure in acts that normally give pleasure. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[18] Seroquel is prescribed for the treatment of schizophrenia, a mental disorder marked by delusions (false beliefs), hallucinations, disrupted thinking, and loss of contact with reality.  It is also used for the treatment of manic and depressive episodes associated with bipolar disorder.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[19] Wellbutrin is indicated for treatment of depression.  PHYSICIANS' DESK REFERENCE (2005).

On May 20, 2008, Plaintiff returned to Dr. Borkoski.  R. 390.  She complained of

headaches.  *Id.*  She was taking Percocet.  *Id.*  Her mental status, cranial nerves, and

motor strength were normal.  *Id.*  His diagnostic impression was daily headaches and

anxiety.  R. 391.  He recommended an eye examination.  *Id.*

On May 23, 2008, Plaintiff returned to Meridian Behavioral Healthcare, Inc.,

reporting that she could not start Cymbalta "due to Medicaid."  R. 366.

On June 18, 2008, Plaintiff saw Dr. Borkoski for followup for her headaches,

which were unchanged.  R. 388.  She was taking Valium and Percocet.  Her mental

status, cranial nerves, and motor strength were normal.  *Id.*  His diagnosis was chronic

pain syndrome and intractable headaches.  R. 389.

On December 1, 2008, Plaintiff had a consultative mental health evaluation by

Bernard B. Bulcourf, Ph.D.  R. 402-407.  She reported to him that her symptoms

included poor memory, appetite disturbance, mood disturbance, emotional lability,

difficulty thinking and concentration, social isolation, decreased energy, somatization

unexplained by organic disturbance, and pathological dependence or passivity.  R. 402.

Dr. Bulcourf said that neuropsychological testing conducted on September 26, 2008,[20]

revealed average range of attention and memory, but revealed clinically significant

elevations in conversation or somatization, anxiety, phobias, depression, social

---

[20] The testing on September 26, 2008, is at R. 408-409 in the record.  She reported
chronic pain at a level of 2 to 4 out of 10.  R. 408.  She said that she had memory
dysfunction, fatigue, and low motivation.  *Id.*  She said she had gained 40-50 pounds
since her brain surgery.  *Id.*  She was independent in her activities of daily living.  *Id.*
Her focus was somatic.  *Id.*  It was determined that there was no empirical evidence to
suggest any deficits in sustained attention or visually or verbally based memory.  *Id.*  A
GAF score of 55 was assigned.  R. 409.

detachment, concentration difficulties, affective stability, identity problems, and aggression.  R. 403.  Plaintiff then was taking Effexor.[21]  *Id.*  Her prognosis was thought to be poor.  *Id.*  Dr. Bulcourf thought that Plaintiff's impairments could last at least twelve months and that her psychiatric condition would exacerbate her experience of pain by decreasing her attention and concentration, and increasing her experience of the frequency and intensity of migraine headaches.  *Id.*  Dr. Bulcourf said that Plaintiff's pain and symptoms would constantly interfere with her ability to give attention and concentrate to perform even simple work tasks.  R. 404.  He said that Plaintiff's impairments would cause her to be absent from work more than three times a month.  *Id.*  He said that Plaintiff had good abilities in a number of work skills, but poor to no ability to maintain regular attendance and be punctual within customary, usually strict tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to deal with normal work stress.  R. 405.  He said that her ability to function was seriously limited, but not precluded, in ability to perform at a consistent pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, and to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes.  *Id.*  He explained that Plaintiff's "somatic lows and vacillating mood will continue to interfere with her work capacity."  *Id.*  He said that she had marked limitations in maintaining social functioning, concentration, persistence, and pace, and

---

[21] Effexor is prescribed for the treatment of depression – that is, a continuing depression that interferes with daily functioning.  Effexor is also prescribed to relieve abnormal anxiety (generalized anxiety disorder and social anxiety disorder), which may include sleep disturbance.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

that she had had four or more episodes of deterioration in a work setting.  R. 407.  He

thought that Plaintiff's condition met or equaled Listing 12.07, Somatoform Disorders,

and 12.04, Affective Disorders.  *Id.*  His diagnosis was Undifferentiated Somatoform

Disorder[22] and Cyclothymic Disorder.[23]  R. 402.

On December 5, 2008, Plaintiff was seen again by Dr. Borkoski.  R. 455.  Her

chief complaint was headaches.  *Id.*  She was using a Duragesic patch, and taking

Percocet, Trazodone, Effexor, and "oxy," probably Oxycodone.  *Id.*  Her mental status,

cranial nerves, and motor strength were normal.  *Id.*  One diagnosis was chronic pain.

R. 456.  The notes are otherwise illegible.

On January 5, 2009, Plaintiff was again seen by Dr. Borkoski.  R. 453.  Her

mental status, cranial nerves, and motor strength were normal.  *Id.*  The diagnosis was

chronic pain and fatigue.  R. 454.  The notes are otherwise illegible.

On February 4, 2009, Plaintiff was involuntarily committed for mental health

treatment pursuant to Florida's Baker Act because she was suicidal and her family had

withheld her pain medications because she had taken too much medication in the prior

two weeks.  R. 418, 420, 424, 426.  She had stopped using the Duragesic patches two

weeks earlier.  R. 424.  Plaintiff said that she had experienced increased irritability,

dysphoria, poor sleep, and impaired concentration.  *Id.*  It was thought possible that she

---

[22] Somatoform Disorder is any of a group of psychological disorders (as body dysmorphic disorder or hypochondriasis) marked by physical complaints for which no organic or physiological explanation is found and for which there is a strong likelihood that psychological factors are involved.  MEDLINE PLUS (MERRIAM-WEBSTER).

[23] Cyclothymic Disorder is a mood disorder characterized by alternating short episodes of depression and hypomania in a form less severe than that of bipolar disorder.  MEDLINE PLUS (MERRIAM-WEBSTER).

was going through opiate withdrawal.  *Id.*  Her insight and judgment were deemed to be impaired.  *Id.*  She said she never intended to hurt herself, but threatened suicide to make her husband give her pain medication.  *Id.*  She denied that she abused her pain medication, but her family gave a "<u>very</u> different story."  *Id.* (emphasis in original).  She was admitted to "ACSU" for treatment.  *Id.*  The diagnosis was substance induced mood disorder and opioid dependence.  R. 425.  Her other medical problems noted were hypertension, migraine headaches, and chronic fatigue syndrome.  *Id.*  Her GAF score assigned on admission was 30 and 40 on discharge 90 minutes later on the same day.  R. 425, 416, 411.

On February 12, 2009, Plaintiff returned to Dr. Borkoski.  R. 449.  His assessment was chronic pain syndrome and headaches.  R. 450.  He prescribed a Duragesic patch and Oxycodone.  *Id.*

On February 27, 2009, Plaintiff saw Dr. Borkoski.  R. 447.  She complained of chronic headaches and low back pain.  *Id.*  Dr. Borkoski's diagnoses were chronic headache, chronic low back pain, and chronic fatigue.  R. 448.  He prescribed a Duragesic patch and Oxycodone.  *Id.*

On March 26, 2009, Plaintiff was seen again by Dr. Borkoski for headaches.  R. 445.  She also reported that she experienced fatigue.  *Id.*  Dr. Borkoski's diagnosis was chronic pain syndrome, and he prescribed a Duragesic patch and Oxycodone.  R. 446.

On May 21, 2009, Dr. Borkoski again saw Plaintiff.  R. 443.  She complained of headaches, and was taking Oxycodone, Effexor, Valium, and Ambien, and using

Duragesic patches.  *Id.*  His diagnosis was chronic cephalalgia.[24]  R. 444.  He wanted a repeat brain MRI.  *Id.*

On June 2, 2009, Plaintiff had an MRI of her brain.  R. 431.  It revealed a 16 mm colloid cyst in the third ventricle that currently was not causing any obstructive hydrocephalus.  *Id.*

On June 19, 2009, Plaintiff returned to Dr. Borkoski.  R. 441.  Headaches were noted.  *Id.*  His diagnosis was chronic pain syndrome.  R. 442.  He also noted recent mania, a bipolar episode, and entered a diagnosis of somatoform or conversation disorder.  *Id.*

On July 17, 2009, Plaintiff saw Dr. Borkoski for chronic headaches.  R. 439.  She was taking Oxycodone and Duragesic patches.  *Id.*  His diagnosis was chronic headaches.  R. 440.

On August 12, 2009, Plaintiff saw Dr. Borkoski again for headaches.  R. 437.  She also complained of leg pain on the right.  *Id.*  Chronic headaches was among the diagnoses listed by Dr. Borkoski.  R. 438.

On September 11, 2009, Plaintiff saw Dr. Borkoski.  R. 435.  She complained of pain and headaches.  *Id.*

On September 17, 2009, Plaintiff had another MRI of her brain.  R. 428.  The MRI revealed the known colloid cyst in her third ventricle and minimal focal

---

[24] Cephalalgia is a headache.  MEDLINE PLUS (MERRIAM-WEBSTER).

encephalomalacia[25] of the right front region where there previously had been a shunt.
*Id.*

On October 9, 2009, Plaintiff saw Dr. Borkoski complaining of pain and
headaches.  R. 433.  It was noted that she was very depressed and anxious.  *Id.*  Dr.
Borkoski determined that Plaintiff needed to be admitted to Meridian Behavioral
inpatient treatment that day (who could not guarantee a bed), and he made a note to
"notify detox."  R. 434.

On October 12, 2009, Plaintiff referred herself for a consultative mental status
examination by Michael Speisman, ARNP, at Putnam Behavioral Healthcare.  R. 462-
466.  Plaintiff's chief complaint was that she felt "awful all the time."  R. 462.  Plaintiff
said that she had been diagnosed as bipolar the year before, and had manic episodes,
but otherwise was depressed all of the time, with a lack of energy.  *Id.*  She said that
she is "never happy, has no interest, is isolative, feels worthless and hopeless."  *Id.*
She said that she has mood swings, crying episodes, and is irritable.  *Id.*  She said that
these problems started when she was a teenager, but were not nearly so severe.  *Id.*
She said that her problems grew worse after brain surgery.  *Id.*  She had never been
prescribed an anti-psychotic or a mood stabilizer.  *Id.*  She had been on anti-
depressants, with poor response.  R. 465.  It was thought that she could benefit from
"psychopharmacological intervention and individual counseling."  *Id.*  On examination it
was noted that her mood was depressed and her affect was sad and tearful.  R. 464.
Her short term memory was poor.  *Id.*  Plaintiff's ability to abstract was not tested due to

---

[25] Encephalomalacia is a softening of the brain.  DORLAND'S MEDICAL DICTIONARY FOR
HEALTHCARE CONSUMERS.

the level of pain and distress during the interview.  *Id.*  Her judgment and insight were

fair.  *Id.*  All other portions of the examination reported normal results.  *Id.*  Depakote

was prescribed, and a GAF score of 55 was assigned.  R. 465.

**Legal analysis**

> **Whether the ALJ erred in failing to discuss the weight to be given to the February 28, 2008, opinion of the consultative psychologist, Dr. Abeles, by discounting the December 1, 2008, opinion of Dr. Bulcourf, and by not discussing Plaintiff's involuntary mental health treatment in February, 2009**

These arguments, raised in contentions one and three, all relate to the manner in

which the Administrative Law Judge evaluated the evidence of Plaintiff's mental health

condition.  After what she called "superficial" testing, Dr. Abeles said that Plaintiff's

recent memory abilities appeared to be decreased.  R. 336.  Dr. Abeles's diagnostic

impression was cognitive disorder, not otherwise specified, and depressive disorder, not

otherwise specified.  Id.  She assigned a current Global Assessment of Functioning

score of 60, indicating only moderate impairment.  *Id.*   Dr. Abeles concluded that

Plaintiff had "some cognitive impairments" with respect to memory, but recommended

that she be further evaluated.  R. 337.  She said that her "current level of functioning

would preclude her from obtaining or maintaining employment," but implied that this was

based upon Plaintiff's physical problems.  *Id.*  Dr. Abeles said that the Plaintiff was

cooperative and the results of her examination were valid.  R. 336.

When discussing Plaintiff's mental impairments, the Administrative Law Judge

cited the finding of Dr. Abeles that Plaintiff did not have any psychotic or thought

disorder.  R. 25.  He noted this at the point that he was discussing the brain surgery, as

evidence that Plaintiff was not psychotic as a consequence of the brain tumor or the surgery.  He did not discuss the remainder of this evaluation by Dr. Abeles.  R. 23, 25.

Dr. Abeles, however, described her testing as superficial, and found only a suggestion of impairment of recent memory.  She recommended further testing.  Her opinion as to Plaintiff's ability to work, which admittedly is reserved to the Commissioner, seems based upon her perception of Plaintiff's physical problems only, and she did not have the expertise to evaluate physical impairments.  Were this the only argument by Plaintiff relating to the ALJ's evaluation of the evidence pertaining to her mental impairments, it would be found to be unpersuasive.

However, the findings of Dr. Bulcourf are another matter.  Dr. Bulcourf was of the opinion that Plaintiff's mental impairment was severe.  While testing revealed that Plaintiff had average range of attention and memory, testing also showed clinically significant elevations in conversion or somatization, anxiety, phobias, depression, social detachment, concentration difficulties, affective stability, identity problems, and aggression, and her prognosis was poor.  R. 403.  Dr. Bulcourf thought that Plaintiff's psychiatric condition would exacerbate her experience of pain by decreasing her attention and concentration, and increasing her experience of the frequency and intensity of migraine headaches.  This finding is important because the ALJ is required to consider impairments in combination.  20 C.F.R. §§ 404.1523 and 416.923; Lucas v. Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990); Swindle v. Sullivan, 914 F.2d 222, 226 (11th Cir. 1990); Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993); Hudson v. Heckler, 755 F.2d 781, 785 and n. 2 (11th Cir. 1985).

Dr. Bulcourf said that Plaintiff's pain and symptoms would constantly interfere with her ability to give attention and concentrate to perform even simple work tasks, and would cause her to be absent from work more than three times a month.  R. 404.  He said that Plaintiff had poor to no ability to maintain regular attendance and be punctual within customary, usually strict tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to deal with normal work stress.  R. 405.  He said that her functioning was seriously limited, but not precluded, in ability to perform at a consistent pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, and to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes.  *Id.*  He explained that Plaintiff's "somatic lows and vacillating mood will continue to interfere with her work capacity."  *Id.*  He said that she had marked limitations in maintaining social functioning, concentration, persistence, and pace, and that she had had four or more episodes of deterioration in a work setting. R. 407.  He thought that Plaintiff's condition met or equaled Listing 12.07, Somatoform Disorders, and 12.04, Affective Disorders.  *Id.*

A consultative examination, that is, a one-time examination by a physician who is not a treating physician like Dr. Bulcourf, need not be given deference by the Commissioner.  McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987); Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (a consulting physician's opinion "deserves no special weight").  The opinion of a consultative physician, however, is still a medical opinion deserving of consideration along with all of the other evidence.  If the opinion of a consulting physician is consistent with other medical evidence, it is entitled to great

weight.  Moncrief v. Astrue, 300 Fed.Appx. 879, 881 (11th Cir. Dec 1, 2008) (not

selected for publication in the Federal Reporter, No. 08-12853) (citing  20 C.F.R. §

404.1527(f)(2)(i)).

Thus, the ALJ was required to have good reasons, supported by substantial

evidence in the record, for rejecting the testing and opinion of Dr. Bulcourf.  The ALJ

simply said he gave minimal credibility to those findings.  R. 25.  He did not explain why.

He implied that the findings were not credible because expressed on a "checklist," but

the findings were derived from objective psychological tests administered by Dr.

Bulcourf.  R. 408-409.  Without explanation, the ALJ relied upon the psychological

opinion of a state agency psychologist as a reason to disregard the opinion of Dr.

Bulcourf.  R. 25, citing Exhibit 10F.  The state agency psychologist used a checklist, so

the "use of a checklist" is not an adequate reason to discount the findings of Dr.

Bulcourf.  Further, the state agency opinion is dated April 1, 2008.  R. 338.  The state

agency psychologist did not consider the testing and opinion of Dr. Bulcourf, which did

not occur until December 1, 2008.  R. 402.  These reasons for discounting the findings

of Dr. Bulcourf are not supported by substantial evidence in the record.

Defendant provides two post hoc arguments to justify the ALJ's dismissal of Dr.

Bulcourf's findings.  Doc. 15, p. 17.  This is improper.  On administrative review of an

action of an agency of the Executive Branch, this court may not "substitute counsel's

post hoc rationale for the reasoning supplied by the" agency itself.  N.L.R.B. v. Kentucky

River Community Care, Inc., 532 U.S. 706, 715 n.1, 121 S.Ct. 1861, 1868 n.1, 149

L.Ed.2d 939 (2001), quoting, N.L.R.B. v. Yeshiva Univ., 444 U.S. 672, 685, n. 22, 100

S.Ct. 856, 63 L.Ed.2d 115 (1980) (citing Securities and Exchange Commission v.

Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)[26]); Real

v. Simon, 514 F.2d 738, 739 (5th Cir. 1975) (denying rehearing of Real v. Simon, 510

F.2d 557 (5th Cir. 1975)); Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003);

Fargnoli v. Massanari, 247 F.3d 34, 44 n. 7 (3d Cir. 2001); Owens v. Heckler, 748 F.2d

1511, 1516 (11th Cir. 1984) ("We decline, however, to affirm simply because some

rationale might have supported the ALJ's conclusion.  Such an approach would not

advance the ends of reasoned decision making.") (citing Chenery); McDaniel v. Bowen,

800 F.2d 1026, 1032 (11th Cir. 1986).[27]  While the court may "uphold a decision of less

---

[26] Chenery Corp. held:

> When the case was first here, we emphasized a simple but fundamental
> rule of administrative law.  That rule is to the effect that a reviewing court,
> in dealing with a determination or judgment which an administrative
> agency alone is authorized to make, must judge the propriety of such
> action solely by the grounds invoked by the agency.  If those grounds are
> inadequate or improper, the court is powerless to affirm the administrative
> action by substituting what it considers to be a more adequate or proper
> basis.  To do so would propel the court into the domain which Congress
> has set aside exclusively for the administrative agency.

Chenery Corp., 332 U.S. at 196, 67 S.Ct. at 1577.

[27] McDaniel v. Bowen reasoned:

> The Secretary urges that even had the *Brady* standard been applied
> correctly at step two, denial of McDaniel's claim at step two would have
> been required, and therefore the determination by the ALJ should be
> affirmed.  We are well aware of the overload of disability claims facing the
> Secretary.  This awareness tempts this court in cases like this in which it is
> not shown that the correct standard has been applied by the ALJ.  It
> tempts this court to cut through delay by evaluating the administrative
> record itself and, applying the correct legal standard, determining for itself
> whether the claimant has met her step two burden (and, possibly, if it
> determines she has met that burden, by going on to apply the balance of
> the sequential steps).  The temptation must be resisted, however.  Even
> though motivated by a desire to reduce the Secretary's caseload, it would

than ideal clarity if the agency's path may reasonably be discerned,"[28] the Commissioner's reasoning cannot be discerned here at all.

Further, the reasons offered now are not persuasive. First, Defendant argues that there was an inconsistency, that Dr. Bulcourf found that Plaintiff had average functioning in attention and memory, and then concluded that she had reduced attention and concentration. He did not so find. He did find that she had average functioning in attention and memory, but only found that she had reduced ability to concentrate, in addition to clinically significant elevations in conversion or somatization, anxiety, phobias, depression, social detachment, affective stability, identity problems, and aggression. R. 403. While "attention" and "concentration" are closely related, one arguably may be attentive, aware of something, and yet not be able to concentrate upon it for any length of time.

Second, Defendant argues that the ALJ accounted for the test results obtained by Dr. Bulcourf by determining a residual functional capacity limited to simple tasks without having to deal with the stress of high production quotas or rapid assembly. Doc. 15, p. 17. That is not persuasive because it disregards, without articulated justification,

―――――――――――

be an affront to the administrative process if courts were to engage in direct fact finding in these Social Security disability cases. The Congressional scheme is that, governed by standards promulgated by Congress and interpreted by the courts, the administrator is to find the facts case by case and make the determination of presence or absence of disability, and that, in the course of judicial review, the courts are then to respect the administrative determination.

800 F.2d at 1032.

[28] Manasota-88, Inc. v. Thomas, 799 F.2d 687, 691 (11th Cir. 1986).

Dr. Bulcourf's determination that Plaintiff's mental condition would exacerbate her perception of the pain from headaches, would cause her to be absent from work more than three times a month, and would severely impair her ability to perform work at a consistent pace without an unreasonable number of interruptions, to accept instructions from supervisors, and to get along with co-workers without distracting them.  Even simple work might be impaired or precluded with those limitations.

A remand, therefore, is needed so that the ALJ may fully consider the weight to be given to the opinion of Dr. Bulcourf.  The ALJ may not reject the test results from Dr. Bulcourf without a reason supported by substantial evidence in the record.  The state agency opinions now in this record are not substantial evidence because those opinions did not review and discuss Dr. Bulcourf's analysis and test results.

In addition to the evidence from Dr. Bulcourf, Plaintiff asserts that the ALJ erred by not considering and discussing other evidence that Plaintiff's mental impairments have grown worse, that is, the involuntary hospitalization in February, 2009.  Plaintiff is correct.  While that was a very brief period of inpatient treatment, it is consistent with the December, 2008, findings of Dr. Bulcourf.  On remand, the ALJ must evaluate and discuss this evidence.

Finally, remand will also provide an opportunity for the ALJ to evaluate and discuss the evidence from Dr. Abeles.

### Whether the ALJ erred in failing to discuss Plaintiff's experience of migraine headaches and to evaluate the effect of her experience of those headaches upon her residual functional capacity

Plaintiff faults the ALJ for not finding that her experience of headaches was a "severe" impairment at step 2, and for not thereafter considering the effect that such headaches would have upon her residual functional capacity.  Doc. 13, p. 16.

At step 2, the issue is whether Plaintiff has shown that he or she has a condition which has more than "a minimal effect on her ability to:  walk, stand, sit, lift, push, pull, reach, carry, or handle, etc."  Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20 C.F.R. § 404.1521).  "In other words, the 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality."  McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

"[I]n order for an impairment to be non-severe, 'it [must be] a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.' "  Parker v. Bowen, 793 F.2d 1177, 1181 (11th Cir. 1986), citing Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984), Edwards v. Heckler, 736 F.2d 625, 630 (11th Cir. 1984), and Flynn, 768 F.2d at 1274.  "Step two is a threshold inquiry.  It allows only claims based on the most trivial impairments to be rejected.  The claimant's burden at step two is mild."  McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) (clarifying Brady).  A "severe impairment" is a "de minimis requirement which only screens out those applicants whose medical problems could 'not possibly' prevent them

from working." Stratton v. Bowen, 827 F.2d 1447, 1452 n. 9 (11th Cir. 1987), *quoting*

Baeder v. Heckler, 768 F.2d 547, 551 (3d Cir. 1985).  It also has been characterized by

the Supreme Court as a criterion which identifies "at an early stage those claimants

whose medical impairments are so *slight* that it is unlikely they would be found to be

disabled even if their age, education and experience were taken into consideration."

Stratton, 827 F.2d at 1452 n. 9 (emphasis by the court), *quoting* Bowen v. Yuckert, 482

U.S. 137, 153, 107 S.Ct. 2287, 2297, 96 L.Ed.2d 119 (1987).

An erroneous finding as to "severe" impairments at step 2 may improperly

foreclose a claimant's "ability to demonstrate the merits of her claim for disability with

respect to her former work activities."  Flynn, 768 F.2d at 1275.  Impairments must be

evaluated in combination at all stages of the analysis, even though some are not

severe.  20 C.F.R. §§ 404.1523 and 416.923; Lucas v. Sullivan, 918 F.2d 1567, 1574

(11th Cir. 1990); Swindle v. Sullivan, 914 F.2d 222, 226 (11th Cir. 1990); Davis v.

Shalala, 985 F.2d 528, 534 (11th Cir. 1993); Hudson v. Heckler, 755 F.2d 781, 785 and

n. 2 (11th Cir. 1985).  The Eleventh Circuit has "repeatedly held that an ALJ must make

specific and well-articulated findings as to the effect of the combination of impairments

when determining whether an individual is disabled."  Davis v. Shalala, 985 F.2d at 534.

Defendant argues that while the ALJ did not find that Plaintiff's headaches were a

"severe" impairment at step 2, he did list "status post colloid cyst ventriculostomy to

relieve hydrocephalus" as a "severe" impairment.  Doc. 15, p. 10.  Defendant contends:

"Plaintiff's argument that her migraines should be listed independent from her cyst and

prior surgery is illogical, considering that Plaintiff's own testimony links the migraines to

the cyst and surgery."  *Id.*  Defendant then points out that the ALJ did discuss the

medical evidence related to the brain surgery.  *Id.*, citing R. 25.  Defendant further

points out that the ALJ had noted that Dr. Adhami said that Plaintiff had recovered from

the brain surgery.  R. 25.  Defendant argues that draining the fluid from the area during

surgery "effectively relieved Plaintiff's headaches."  Doc. 15, p. 11, citing R. 247-248.

Finally, Defendant notes that the later MRI scans have shown no recurrence of

hydrocephalus.  *Id.*  Defendant argues that the evidence from Dr. Borkoski's treatment

notes "reflects nothing more than Plaintiff's subjective complaints."  *Id.*

There is no medical evidence at all that the brain surgery permanently relieved

Plaintiff's headaches, and certainly no record discussed by the ALJ.  Most of

Defendant's argument is *post hoc* reasoning but, as noted earlier, the reasoning should

have come from the ALJ.

Moreover, much of this after the fact reasoning is not persuasive.  The record

cited, R. 247-248, is the report of the surgery itself.  This portion of the record does not

contain a conclusion that the surgery permanently relieved Plaintiff of headaches.

On August 23, 2006, shortly after the surgery, Plaintiff reported that her

headaches had completely resolved.  R. 259.  By April 2, 2007, however, Plaintiff

returned to her physician for a evaluation of possible shunt replacement.  R. 263.

Although the MRI had shown no hydrocephalus, Plaintiff reported that she continued to

suffer many of the same symptoms, including fatigue, memory loss, muscle ache,

nausea, and headaches.  *Id.*  She said that the symptoms had begun suddenly a week

earlier.  R. 264.  The record shows that she was treated with many different kinds of

medications over the next two years for headaches, among other problems.  To say, as

Defendant says here, that Dr. Borkoski's treatment of Plaintiff's headaches could be

disregarded by the ALJ because those Dr. Borkoski's "notes reflect nothing more than Plaintiff's subjective complaints," doc. 15, p. 11, neither addresses the problem (that the ALJ failed to even mention the evidence that Dr. Borkoski treated Plaintiff for severe headaches) nor provides an adequate *post hac* reason (not articulated by the ALJ) to discount the evidence from Dr. Borkowski, since a report of a headache is always subjective.  Indeed, Defendant's argument that the brain surgery resolved the problem of headaches is, itself, based entirely upon Plaintiff's subjective report shortly after the surgery.  A remand is needed so that the Administrative Law Judge may fully consider the medical evidence that Plaintiff has continued to suffer headaches after her brain surgery, and to determine to what extent that problem, when considered in combination with all other problems, affects Plaintiff's residual functional capacity.  In doing so, the ALJ must follow the rules discussed above establishing the very light threshold burden of showing a "severe" impairment at step 2.

**Conclusion**

Accordingly, it is **ORDERED** that:

1.  The decision of the Commissioner to deny Plaintiff's application for Social Security benefits is **REVERSED**.

2.  Plaintiff's application for social security benefits is **REMANDED** to the Commissioner to (1) evaluate and discuss the weight to be given to the mental health evidence from Dr. Bulcourf, Dr. Abeles, and the February, 2009, "Baker Act" treatment, (2) to evaluate and discuss the weight to be given to the evidence that Plaintiff suffers from frequent significant headaches, and (3) to consider the evidence of these

impairments, if any, and others, in combination when determining Plaintiff's residual functional capacity.

3.  The Clerk is **DIRECTED** to enter judgment in favor of Plaintiff accordingly.

**DONE AND ORDERED** on July 12, 2011.

<u>s/     William C. Sherrill, Jr.</u>
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**